**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

COROTOMAN, INC.,

                Plaintiff,

v.                                        CIVIL ACTION NO.  2:21-cv-00545

CENTRAL WEST VIRGINIA REGIONAL
AIRPORT AUTHORITY, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Corotoman's Motion for Partial Summary Judgment* (Document 10), the *Memorandum in Support of Motion for Partial Summary Judgment on Liability Against Central West Virginia Regional Airport Authority, Inc., on Limited Issues of Contract Formation* (Document 11), *Central West Virginia Regional Airport Authority's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment* (Document 23), the *Plaintiff's Reply in Further Support of Its Motion for Partial Summary Judgment* (Document 46), and all attached exhibits. For the reasons stated herein, the Court finds that Corotoman's motion should be granted.

**FACTS**

The Plaintiff, Corotoman, Inc., is a development company that owned property in the vicinity of Yeager Airport in Charleston, West Virginia. Its president is John Wellford. The Central West Virginia Regional Airport Authority (Airport Authority) operates Yeager Airport. The airport director was Richard Atkinson from 1999 through July 2015. The Airport Authority Board of Directors consists of unpaid members appointed by local and regional governmental

bodies.   The President of the Board of Directors at all relevant times was R. Edison Hill.   The

Airport Authority was represented by attorney Charles (Chuck) Bailey and his firm of Bailey &

Wyant, as outside counsel, at all relevant times.

This suit was originally filed as an adversary proceeding in Corotoman's bankruptcy case

in the Bankruptcy Court for the Southern District of West Virginia.   (2:19-BK-20134; 2:19-AP-

2013.)   The Court granted a motion to withdraw the reference on September 24, 2021.   (Mem.

Op., Document 9 in 2:21-mc-120.)

A knoll located on property not owned by the Airport Authority created an obstruction that

resulted in weight restrictions for some flights, particularly in hot weather.   The Airport Authority

obtained a grant from the FAA to remove the obstruction.   It contracted with L.R. Kimball &

Associates to assist in the project, and L.R. Kimball used subcontractor O.R. Colan to handle land

acquisition.   O.R. Colan evaluated the value of parcels of property the Airport Authority needed

to obtain and assisted in preparing offers to property owners.

Corotoman was the largest single property owner in the obstruction removal area.   Mr.

Atkinson signed a letter on February 24, 2011, offering, on behalf of the Airport Authority, to

purchase several properties from Corotoman for $260,125.   Mr. Wellford was not satisfied with

the offer and was reluctant to sell.   In an effort to avoid litigation through the condemnation

process, Mr. Atkinson and Mr. Wellford began negotiating an agreement that provided for an

exchange of certain properties and for a license and easement that would permit the Airport

Authority to remove the obstruction and utilize the airspace while Mr. Wellford retained

ownership.   Mr. Atkinson informed the Board of the status of negotiations.   Minutes from a June

29, 2011 board meeting reflect that the Airport Authority had not yet reached an agreement with

one large property owner (Corotoman).    The minutes for an August 23, 2011 board meeting note

agreement in principal with the large property owner for an avigation easement, removal of the

obstruction, and a property swap.    Although the FAA later rejected aspects of the agreement, Mr.

Atkinson testified that he consulted with the FAA about the proposal and verified that an easement

for the property would be acceptable, and that a land swap of like parcels could be approved.

On March 27, 2012, a real estate broker acting on behalf of Corotoman emailed a proposed

Settlement Agreement and exhibits to Mr. Bailey, as well as Mr. Wellford and Kent George, an

attorney representing Corotoman.    During the board meeting the next day, at which Mr. Bailey

was present, the agreement was described to the Board, noting that it was for an easement and

license agreement and property swap with a price of $350,000 to be funded through the FAA grant.

According to the minutes, "Mr. Hill asked for approval of the agreement and authorization for him

to sign once the draft agreement was reviewed by legal counsel," another board member moved

for approval, and the motion was unanimously approved.    (Pl.'s Ex. K, Minutes, March 28, 2012

Board Meeting) (Document 10-12.)

Mr. Bailey's billing invoice reflects review of the draft Settlement Agreement and

communications with Mr. Atkinson and with agents and counsel for Corotoman regarding the

agreement throughout the months of April and May.    (Pl.'s Ex. M, Bailey & Wyant Invoice for

May 15, 2012) (Document 10-14); (Pl.'s Ex. N, Bailey & Wyant Invoice for June 14, 2012)

(Document 10-15.)    In email communications, he noted changes to a liquidated damages

provision in which he proposed language establishing liquidated damages at $10,000 per breach.

A License and Work Agreement was attached to the Settlement Agreement, among other

exhibits including maps, proposed deeds, and an avigation easement.    In a May 9, 2012 email, Joe

3

Merical, an attorney representing Corotoman, provided a redlined draft of the Settlement Agreement and License and Work Agreement to Mr. Bailey.   Mr. Bailey forwarded the email and attachments to Mr. Atkinson on May 11, 2012.   The redlined provisions included changes to a section addressing a requirement that the Airport Authority overblast in the area of the avigation easement, increasing the overblast from 20 feet to 35 feet and added language requiring that the final grade be at least10 feet below the elevation of the planned avigation easement.   Mr. Bailey also arranged a meeting for May 14, 2012, to view all of the maps and exhibits related to the agreement.   Although both Mr. Bailey and Mr. Atkinson received emails with the changes to the overblast requirement, they both testified that they did not fully understand what was required by that provision.

On June 21, 2012, Mr. Bailey emailed Mr. Merical with the following message: "Joe please get John [Wellford] to sign asp [sic] and I can have Rick [Atkinson] sign tomorrow.   Could you hand deliver to me today the final version with attachments and I will have Rick sign tomorrow." (Pl.'s Ex. R, June 21, 2012 email from Chuck Bailey to Joe Merical) (Document 10-19.)   Mr. Bailey testified that he sent the email indicating that Mr. Atkinson would sign because Mr. Atkinson told him he was ready to sign the agreement, and it did not occur to Mr. Bailey to question Mr. Atkinson's authority to sign the agreement.   Mr. Atkinson signed the Settlement Agreement as Airport Director on June 22, 2012, and his signature was notarized by a Bailey & Wyant employee.   He also signed the License and Work Agreement on July 5, 2012, and it contains the notary stamp of April Payne, an Airport Authority employee.   Mr. Wellford signed both documents and had his signature notarized on July 5, 2012.   Mr. Atkinson testified that he believed he had authority to sign the agreement, as the Board had approved the agreement pending

attorney review, and both he and Mr. Hill routinely signed contracts that had been approved by the

Board and reviewed by counsel.

Mr. Hill testified that only he had authority to sign the Settlement Agreement or similar

major contracts.   He explained that he "made it a practice never to read those documents" to avoid

being in a position of giving legal advice to the Airport Authority.   (Pl.'s Ex. F, Hill Depo. at

17::16-17) (Document 10-7.)   He was aware of the obstruction removal project but relied entirely

on Mr. Atkinson as the Director and Mr. Bailey as counsel to negotiate contracts, obtain property,

and otherwise effectuate the project, while his involvement was limited to presiding over meetings

where it was discussed.   Mr. Hill did not realize that the Settlement Agreement was not presented

for his signature after it had been approved pending legal review during the board meeting. He

typically received a stack of documents to sign that had been approved by counsel, with the

signature spaces marked, and he signed without further review.   He could not recall whether he

had signed other contracts related to property acquisition for the obstruction removal project.   In

addition to his role as Chairman of the Board for the Airport Authority, Mr. Hill is a private pilot,

and indicated that he observed work on the obstruction removal project while flying, and that he

and other pilots, including those for commercial airlines, flew in the airspace at issue in the

easement and Settlement Agreement.

Section Two of the Settlement Agreement, titled "Nature of Agreement," outlines the

contours of the agreement:

> [I]n lieu of condemnation, Corotoman agrees to grant a license for
> certain work to be performed on certain real property
> currently owned by Corotoman and to grant an easement for the passage of
> aircraft over certain real property.   As fair and just compensation
> for said rights, including severance damages to Corotoman's
> remaining property rights, the Airport Authority agrees to perform

> certain work on certain real property owned by Corotoman,
> exchange certain other real property with Corotoman, and reimburse
> Corotoman for the severance damages caused by the airport
> Authority's acquisition of property rights under this Settlement
> Agreement."

(Pl.'s Ex. A, Settlement Agreement, at p. 2) (Document 10-2.)   The License and Work Agreement

includes specific terms related to the work to be performed, including when work was to

commence and be completed, the language regarding the overblast and final grade for the property

at completion, and other provisions on insurance, stormwater retention and control, remedies for

breach, etc.

After he had signed the Settlement Agreement, Mr. Atkinson sent a letter dated June 25,

2012, to Kim Lewis, the Assistant Airport Director, directing issuance of a check in the amount of

$250,000 pursuant to the contract.   That check is listed among the invoices for Board approval in

the board meeting packet for the July 25, 2012 meeting, labeled "invoices for construction

projects/under contract."   (Pl.'s Ex. V, July 25, 2012 board meeting packet) (Document 10-23.)

The minutes for the July 25, 2012 board meeting likewise indicate that "Mr. Foster provided the

following invoices that had been paid pursuant to the policy of the Board: Corotoman, Inc -

$250,000, land acquisition/obstruction removal project."   (Pl.'s Ex. W, July 15, 2012 board

meeting minutes) (Document 10-24.)   During a September 26, 2012 board meeting, the Board

unanimously approved the proposed land swap of specific properties related to the Settlement

Agreement, although it was not effectuated.

The obstruction removal project opened for bids on July 24, 2012, and the Board was

informed of the status.   However, the project had to be re-bid and did not begin until sometime in

2013.   The minutes from a board meeting on September 18, 2013, reflect that the contract was

6

awarded to Central Contracting, and noted an agreement with Corotoman to use a road through Corotoman's North Gate business park for access to the project site.   (Pl.'s Ex. BB, September 18, 2013 board meeting minutes) (Document 10-29.)   In his capacity as Chairman of the Board, Mr. Hill signed a License to Utilize Paved Road and Work Agreement with Corotoman, dated September 12, 2013.   (P.'s Ex. AA, Paved Road Agreement) (Document 10-28.)   That agreement permits the Airport Authority and its agents to use the road and makes the Airport Authority responsible for repairs.   A provision related to breach of the License contains reference to the earlier Settlement Agreement: "Notwithstanding any breach by either party of this Work Agreement, the Settlement Agreement shall remain in force and effect to the fullest extent possible. Failure to complete the Project contemplated by this Work Agreement shall not affect the provisions of the Settlement Agreement regarding mutual release of prior claims and future condemnation of Corotoman's real property."   (Paved Road Agreement, at 5.)

Work on the project proceeded, but the overblasting contemplated by the Settlement Agreement and License and Work Agreement did not occur.   Mr. Atkinson stated that he spoke with someone at Central Contracting, who indicated that it was not part of their contract with the Airport Authority and would cost more to overblast in accordance with the terms of the contract with Corotoman.   Mr. Hill testified that he believed, based on later conversations with an engineer, that overblasting would be prohibitively expensive or impossible, at least in part because of large utility lines in the area.

In March 2015, a slope failure at Yeager Airport impacted local residences, roads, and a church.   The Board granted Mr. Atkinson emergency authority to quickly address the crisis, including negotiating with landowners to compensate them for damages and working to repair the

7

slope failure.   Mr. Atkinson began negotiating with Mr. Wellford and Corotoman to potentially obtain a piece of property related to the slope failure, and to use fill material from a Corotoman property.   He signed an option agreement for the property, and certain payments were made to Corotoman in relation to the agreement and negotiations.   However, he left the Airport Authority in July 2015, before finalizing agreements with Corotoman addressing both slope repair work and some continued work related to that required by the 2012 Settlement Agreement.

Mr. Atkinson explained that the exchange of properties contemplated by the 2012 agreement could not occur until completion of the project, when new surveys could be conducted based on the new contours and square footage.   That had not occurred when he left his position with the Airport Authority in 2015 and has not occurred to date.   The avigation easement likewise has not been finalized.   FAA approval would be required for disposition of property owned by the Airport Authority, and Mr. Bailey testified that he was unable to negotiate FAA approval for the proposed property exchange.   The FAA was dissatisfied with the agreement negotiated with Corotoman, including the failure to obtain the easement or ownership of the property from the outset, and the Airport Authority repaid the $250,000 that had been paid to Corotoman from FAA funds.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v.*

*Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).   A "material fact" is a fact that could

affect the outcome of the case.   *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v.*

*Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   A "genuine issue" concerning

a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict

in the nonmoving party's favor.   *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News &*

*Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material

fact, and that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp.*,

477 U.S. at 322–23.   When determining whether summary judgment is appropriate, a court must

view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light

most favorable to the nonmoving party.   *Hoschar*, 739 F.3d at 169.   However, the non-moving

party must offer some "concrete evidence from which a reasonable juror could return a verdict in

his favor."   *Anderson*, 477 U.S. at 256.   "At the summary judgment stage, the non-moving party

must come forward with more than 'mere speculation or the building of one inference upon

another' to resist dismissal of the action."   *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and

determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of

credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar.

31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).   If

disputes over a material fact exist that "can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## RIPENESS

The Airport Authority argues that this motion for partial summary judgment is premature because discovery is not yet complete. It argues that a deposition from a Corotoman representative is necessary to address Corotoman's understanding of the terms of the Settlement Agreement and License and Work Agreement, as well as its knowledge of Airport Authority contracting procedures. In addition, it contends that a discovery dispute between Bailey & Wyant and Corotoman and the lack of discovery as to the co-defendant contractors who performed work on the Corotoman property preclude summary judgment at this stage.

The Court finds that the outstanding discovery cited by the Airport Authority is not material to the issues presented in this motion for partial summary judgment. This motion seeks judgment only as to the validity of the contract. There is no question that John Wellford signed on behalf of Corotoman and had the requisite authority to do so. This motion does not resolve any dispute regarding the terms of the agreement, for which Corotoman's state of mind would be relevant. Likewise, discovery from the co-defendants who performed work on the property can have no relevance to whether the Airport Authority entered into the contract with Corotoman. Therefore, the Court finds no need to delay consideration, and finds that prompt resolution of this dispute may help move the case forward in the most efficient manner.

10

### DISCUSSION

Corotoman seeks summary judgment on the issues of contract formation and ratification. It contends that there was mutual assent to the Settlement Agreement because the Board was informed about the agreement, the Board approved the agreement pending attorney review, Mr. Bailey provided such review, and the Board approved payments and a land swap pursuant to the contract. Even if Mr. Hill, rather than Mr. Atkinson, was the proper signatory, Corotoman argues that Mr. Hill's failure to sign has no impact on the Airport Authority's assent to the contract, given Mr. Hill's testimony that he would have signed without reading the agreement and the Board proceeded as if the contract had been properly signed. Corotoman further asserts that Mr. Atkinson did have either actual or apparent authority to sign the contract based on agency principles, Mr. Atkinson's role at the airport and in negotiations with Corotoman, and Mr. Bailey's involvement in informing Corotoman that Mr. Atkinson would sign. In addition, Corotoman contends that the Airport Authority ratified the Settlement Agreement when Mr. Hill signed the Paved Road Agreement in September 2013, because that agreement expressly referenced and reaffirmed the Settlement Agreement. Further, by making payments, approving the land swap, and entering the property pursuant to the contract, Corotoman contends that the Airport Authority impliedly ratified the Settlement Agreement. Finally, Corotoman argues that the Airport Authority should be equitably estopped from contesting the validity of the contract.

The Airport Authority argues that summary judgment on the issues of contract formation and ratification is precluded by genuine disputes of material fact. It contends that the terms of the Settlement Agreement changed between the time it was presented to the Board and the time Mr. Atkinson signed. It further contends that neither Mr. Atkinson nor Mr. Bailey "properly

understood or realized the import of the terms of the Settlement Agreement."   (Def.'s Resp. at 7.)

It argues that "[t]here was no mutual assent in this matter because Mr. Atkinson and Corotoman

had different interpretations of the Settlement Agreement and License and Work Agreement, the

meaning of the overblast term, and the state in which the property would be left."   (*Id.* at 8.)   The

Airport Authority next contends that Mr. Atkinson lacked actual authority to sign the Settlement

Agreement, because the Board expressly authorized Mr. Hill to sign and the bylaws governing

contracts condition authority to enter into contracts on authorization by the Board.   It further

argues that Corotoman cannot demonstrate that Mr. Atkinson had apparent authority because it

has not presented evidence as to its knowledge or beliefs about his authority.   The Airport

Authority notes that Mr. Wellford is a former Airport Authority Board member and would

therefore have had an understanding of the general operations of the Airport Authority.   It

contends that it did not ratify the Settlement Agreement because it never formally voted to do so,

pointing out that Mr. Hill "was unaware that Mr. Atkinson had inappropriately signed the

Settlement Agreement until after Mr. Atkinson unceremoniously left his position in 2015."   (*Id.*

at 13.)   It argues that "[t]o the extent the Airport Authority took any action pursuant to the

Settlement Agreement, it did so under the mistaken belief that Mr. Atkinson and Mr. Bailey were

properly carrying out their duties."   (*Id.* at 14.)   Finally, it argues that equitable estoppel is

inappropriate because "Corotoman points to no representations made by the Airport Authority

itself, only by Mr. Atkinson and Mr. Bailey," who it has asserted "were acting inappropriately."

(*Id.* at 15.)

Under West Virginia law, "[t]he elements of a contract are an offer and an acceptance

supported by consideration."   *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 556 (W. Va.

12

2012).   "The fundamentals of a legal contract are competent parties, legal subject matter, valuable

consideration and mutual assent.   There can be no contract if there is one of these essential

elements upon which the minds of the parties are not in agreement."   *Id.* at Syl. Pt. 3.   The West

Virginia Supreme Court of Appeals held:

> It is elementary that mutuality of assent is an essential element of all
> contracts. In order for this mutuality to exist, it is necessary that
> there be a proposal or offer on the part of one party and an
> acceptance on the part of the other. Both the offer and acceptance
> may be by word, act or conduct that evince the intention of the
> parties to contract. That their minds have met may be shown by
> direct evidence of an actual agreement or by indirect evidence
> through facts from which an agreement may be implied.

*Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450–51 (W. Va. 1993) (internal citations omitted).

The Fourth Circuit explained: "While identifiable offer and acceptance are the classic mechanisms

for contract formation, 'manifestation of mutual assent may be made even though neither offer nor

acceptance can be identified and even though the moment of formation cannot be determined.'"

*Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir. 1979) (quoting Restatement

(Second) of Contracts, s 22(2)).

Corotoman has demonstrated that the Airport Authority sought an agreement to obtain

ownership of property it owned, or failing that, a license to alter that property and an easement to

use the airspace.   The Airport Authority Board of Directors was informed of the status of the

project and the properties that the Airport needed to obtain to complete the obstruction removal

project.   The Board approved a draft agreement with Corotoman pending review by legal counsel.

Mr. Bailey reviewed the agreement, negotiated some changes, reviewed changes made by

Corotoman's counsel, and informed Corotoman representatives that Mr. Atkinson would sign.

Mr. Hill testified that the Board relied on Mr. Atkinson as Director and Mr. Bailey as counsel to

negotiate the agreement and generally to manage Airport operations and projects, and none of the

Board records suggest anyone raised objections or sought further information about the Corotoman

agreement.   Mr. Hill also testified that he did not read documents that he signed in his capacity as

Chairman of the Board, and therefore was not aware until years later that he had not signed the

Settlement Agreement and License and Work Agreement with Corotoman.

After the Settlement Agreement and License and Work Agreement had been signed by Mr.

Atkinson and Mr. Wellford, the Airport Authority issued a check pursuant to the contract to

Corotoman, and the Board was informed that the money had been paid under contract.   The Board

approved a land swap contemplated by the Settlement Agreement and exhibits.   The Board was

informed as the obstruction removal project was bid out and work began on the properties,

including the Corotoman property.

Corotoman has presented ample evidence of mutual assent.   Regardless of Mr. Atkinson's

authorization to sign, the Board approved the agreement pending legal review, and that legal

review took place.   The Airport Authority may now question the quality of the legal services it

received, and it may now question its decision to place its faith in the former Director, but Mr. Hill

repeatedly emphasized that he and the Board relied on Mr. Atkinson and Mr. Bailey and did not

meddle in the details of Airport operations.   At the time it entered into the Settlement Agreement,

the Board deferred to Counsel to review contracts.   As such, Mr. Hill's lack of knowledge or

understanding of particular contract terms is immaterial to the Airport Authority's intent to enter

into the contract.   *See, e.g., Reddy v. Cmty. Health Found. of Man,* 298 S.E.2d 906, 910 (W. Va.

1982) ("in the absence of extraordinary circumstances, the failure to read a contract before signing

it does not excuse a person from being bound by its terms…A person who fails to read a document to which he places his signature does so at his peril.")

Furthermore, the Airport Authority's actions after the contract had been signed remove any doubt that it assented to the contract: it proceeded to make payments, bid out contracts, and directed the performance of work on the property, as contemplated by the contract.   Absent the contract, the Airport Authority, of course, would have had no legal right to enter Corotoman's land and alter it.   Thus, Corotoman has conclusively established the presence of all elements necessary for contract formation, and the Airport Authority has not put forth any disputed facts material to that issue.

In addition, the Airport Authority has presented no evidence that would permit a jury to find that Mr. Atkinson lacked at least apparent authority to sign the contract.   Under West Virginia law, "[o]ne who by his acts or conduct has permitted another to act apparently or ostensibly as his agent, to the injury of a third person who has dealt with the apparent or ostensible agent in good faith and in the exercise of reasonable prudence, is estopped to deny the agency relationship." Syl. Pt. 3, *Messer v. Huntington Anesthesia Grp., Inc.*, 664 S.E.2d 751, 753 (W. Va. 2008). "Apparent authority depends upon some conduct by the principal, communicated to a third party, that reasonably causes the third party to believe that the agent has authority to conduct a particular transaction."   *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, fn 3 (4th Cir. 2004).

The Airport Authority "relied upon Rick Atkinson to bring this before the Board to recommend measures to accomplish this [the obstruction removal project] and to utilize legal counsel to take the steps necessary to accomplish it," and negotiations for this and other contracts were handled by Mr. Atkinson, Mr. Bailey, or another employee at Mr. Atkinson's direction.

(Hill Depo at 24:24-25:1-3.)   It relies on the bylaws, which provide that "[t]he Board may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument and to affix the corporate seal thereto, in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances."  (Def.'s Ex. M, Bylaws of West Virginia Regional Airport Authority, at 7) (Document 31-13.)   Nothing in that language would inform a third party that the Director lacked authority to sign a contract, particularly a contract that had been negotiated by the Director, had been publicized in the local paper, approved during a Board meeting, and approved by counsel.   Mr. Bailey, in his capacity as counsel to the Airport Authority, informed Corotoman that Mr. Atkinson would sign.   No Board members had direct communications with Corotoman or other property owners that would suggest they were involved in the contracting process.   The Airport Authority's actions made clear that (a) it intended to enter into the contract with Corotoman, (b) Mr. Atkinson and Mr. Bailey were responsible for negotiating the agreement and communicating on its behalf, (c) Mr. Atkinson was a trusted representative who routinely acted on behalf of the Airport Authority, and (d) the Airport Authority considered the contract finalized and proceeded with the obstruction removal project.

Although the finding that the Airport Authority and Corotoman mutually assented and formed a contract is sufficient, the parties also presented significant argument on the issue of whether the Airport Authority ratified the Settlement Agreement and License and Work Agreement.   "Ratification, in sense of affirmation of contract and waiver of defense to it, is a matter of intention...One who has accepted benefits under a contract, or exercised dominion over property acquired thereunder after knowledge of facts warranting rescission, ratifies the

agreement." *Hamilton v. McCall Drilling Co.*, 50 S.E.2d 482, 484–85 (W. Va. 1948) (reaffirmed in *Tri-State Petroleum Corp. v. Coyne*, 814 S.E.2d 205, 220 (W.Va. 2018)).

Even if the Airport Authority had not assented to the Settlement Agreement when it approved the contract pending attorney review and its Director signed it, it expressly and impliedly ratified the agreement by making payments and approving the land swap pursuant to the contract, obtaining the benefit of the contract by entering the property, removing the knoll, and using the airspace, and by entering into the Paved Road Agreement that expressly referenced and reaffirmed the Settlement Agreement.   The Airport Authority's arguments to the contrary rest on its lack of knowledge that Mr. Atkinson, rather than Mr. Hill, had signed the Settlement Agreement.   But it did not lack knowledge that the Settlement Agreement had been signed on its behalf—it was merely unaware of whose signature appeared on the document.

Its arguments that it did not fully understand the terms of the agreement likewise fall short. It chose to delegate contract negotiation and review to its Director and counsel, and any lack of knowledge about the terms of the agreement resulted from board members' decisions not to independently review those documents.[1]   "Ratification typically applies to an entity that accepts benefits knowing the material facts, but an entity is also liable under a ratification theory if it accepts the benefits of a transaction despite knowing that it does not have all the material facts." *In re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, No. 1:13-MD-2493, 2019 WL 7835630, at *11 (N.D.W. Va. Apr. 3, 2019) (citing Restatement § 4.06, cmt. d).   The Airport

---

[1] The Airport Authority's theory seems to be that the Board of Directors may choose to delegate contract negotiations and choose not to review contracts in favor of reliance on the Director and counsel, gain the benefit of said contracts, and remain free to disclaim any contract that later becomes problematic because of that lack of direct knowledge and involvement.   This would leave parties considering entering into agreements with the Airport Authority in an untenable position, with no ability to rely upon contracts negotiated with the agents the Airport Authority assigned to that task.

Authority did not merely passively accept the benefits of the Settlement Agreement and License and Work Agreement.  It actively took steps to obtain those benefits, bidding out a project that relied on its right to access and alter Corotoman's property.   Thus, the Court finds that Corotoman has set forth facts establishing that the Airport Authority ratified the Settlement Agreement and attachments, and no genuine dispute of material facts impedes summary judgment on that question. Having found the contract supported by both mutual assent and ratification, the Court finds consideration of the parties' arguments regarding estoppel unnecessary.  The Court finds that Corotoman is entitled to summary judgment on the issue of contract formation.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Corotoman's Motion for Partial Summary Judgment* (Document 10) be **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:     January 26, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

18